## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRATERNAL ORDER OF POLICE, MIAMI LODGE 20, INSURANCE TRUST FUND on behalf of itself and all others similarly situated, | ) ) ) ) | CASE NO. |
| *Plaintiff*, | ) ) | |
| v. | ) ) | CLASS ACTION COMPLAINT |
| ACTAVIS HOLDCO U.S., INC., BRECKENRIDGE PHARMACEUTICALS, INC., ENDO INTERNATIONAL PLC, HERITAGE PHARMACEUTICALS, INC., MYLAN INC., MYLAN PHARMACEUTICALS INC., PAR PHARMACEUTICALS HOLDINGS, INC., PLIVA, INC., TEVA PHARMACEUTICALS USA, INC., UDL LABORATORIES, INC., and UPSHER-SMITH LABORATORIES, INC. | ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| *Defendants*. | ) | |

## INTRODUCTION

1.      Plaintiff Fraternal Order of Police, Miami Lodge 20, Insurance Trust Fund ("FOP Miami" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this class action for claims under federal and state antitrust and consumer protection laws and the common law of unjust enrichment to recover damages and to obtain injunctive and equitable relief for the injuries it and others similarly situated have sustained against Actavis Holdco U.S., Inc., Breckenridge Pharmaceuticals, Inc., Endo International PLC, Heritage Pharmaceuticals, Inc., Mylan Inc., Mylan Pharmaceuticals Inc., Par Pharmaceuticals Holdings, Inc., Teva Pharmaceuticals USA, Inc., UDL Laboratories, Inc., and Upsher-Smith Laboratories, Inc. (collectively "Defendants") arising from their conspiracy to fix, raise, maintain and stabilize the prices of generic propranolol

("Propranolol"). All allegations herein are based on review of publicly available documents, counsel's investigation, Plaintiff's personal knowledge as to itself, and information and belief.

2.      Propranolol is a beta-blocker, used to treat various heart and circulatory conditions, including angina, hypertension, myocardial infarction prevention, heart rhythm disorders, and other circulatory conditions.  When measured by prescriptions, Propranolol is reportedly the highest-selling beta blocker.

3.      Generic versions of Propranolol have been on the market for years, since the 1980s. During the majority of the time it has been on the market it has been competitively priced significantly below its branded counterpart. This was a direct result of competition spurred by the presence of various generic drugs, which benefit consumers and third-party payors through lower prices.

4.      Within the past three years, beginning no later than December 2013, the U.S. manufacturers of Propranolol capsules conspired to artificially fix, raise, maintain, and/or stabilize the prices of Propranolol sold throughout the United States.  The Propranolol price fixing conspiracy extended to Propranolol tablets by February 2015.

5.      Beginning in December 2013, Defendants substantially increased the price of Propranolol capsules, in unison.  The substantial price increases extended to Propranolol tablets later.  These price increases did not stem from competitive behavior caused by, for instance, supply shortages or changed product demand. Rather, they were the scion of Defendants' broad and wide-ranging conspiracy to fix, raise, maintain and stabilize the prices of these products, and to allocate customers and markets for them. Defendants effectuated their conspiracy by direct business-to-business contacts among generic drug manufacturers, secret communications and meetings, and/or

joint participation taken under the guise of trade associations like the Generic Pharmaceutical Association ("GPhA").

6.      Prior to December 2013, the average price for Propranolol sold in the U.S. was remarkably stable.  However, following Defendants' October 2013 GPhA meeting in Bethesda, Maryland, the prices of Propranolol capsules precipitously increased by over 150% in a matter of months.

7.      According to The U.S. Government Accountability Office ("GAO")[1] and price data gathered by the National Association of State Medicaid Directors, National Drug Acquisition Cost data ("NADAC")[2], Propranolol capsules experienced "extraordinary price increases:"

      a.      By July 2014, the average price of Propranolol 60 mg ER capsules had increased by 164% from pre-December 2013 prices;

      b.       By September 2014, the average price of Propranolol 80 mg ER capsules had increased by 174% from pre-December 2013 prices;

      c.      By July 2014, the average price of Propranolol 120 mg ER capsules had increased by 181% from pre-December 2013 prices;

      d.      By October 2014, the average price of Propranolol 160 mg ER had increased by 174% from pre-December 2013 prices.

8.      Defendants' price increases on Propranolol capsules occurred in lockstep and remained elevated at supra-competitive levels during the Class Period.

---

[1] *See* United States Government Accountability Office, Report of Congressional Requesters, Generic Drugs Under Medicare, Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases (August 2016) at 37, available at http://www.gao.gov/assets/680/679055.pdf.
[2] *See* NDAC (National Average Drug Acquisition Cost) weekly reference data from November 2013 to current week available at https://data.medicaid.gov/Drug-Prices/NDAC-National-Average-Drug-Acquisiton -Cost-/a4y5-998d.

9.      Defendants' price increases on Propranolol tablets were even more astounding. Following the GPhA Fall Technical Conference in Miami, Florida from February 9-11, 2015, which Defendants attended, the average price of Propranolol tablets increased by over 700% in a matter of months:

<blockquote>

a.      By September 2015, the average price of Propranolol 10 mg tablets had increased by 818% from pre-February 2015 prices;

b.      By November 2015, the average price of Propranolol 20 mg tablets had increased by 892% from pre-February 2015 prices;

c.      By February 2016, the average price of Propranolol 40 mg tablets had increased by 1008% from pre-February 2015 prices;

d.      By November 2015, the average price of Propranolol 80 mg tablets had increased by 1033% from pre-February 2015 prices.

</blockquote>

10.     Defendants' price increases on Propranolol tablets occurred in lockstep and remained elevated at supra-competitive levels during the Class Period.

11.     As is true with any generic drug, Propranolol is a commodity product.  Therefore, Defendants' price increases were against their respective self-interests.  In a competitive market, absent a conspiracy or some outside factor justifying a price increase, if a manufacturer substantially increased the price of Propranolol, its competitors would likely seek to sell more Propranolol to its customers rather than increase its prices by the same amounts.

12.     Absent increasing costs of manufacturing Propranolol, a significant decrease in or increase in demand for Propranolol, it would be contrary to Defendants' self-interest to raise prices absent a cartel.

13.     These price increases, along with similar ones for other generic drugs have garnered scrutiny from federal and state governments alike. The Department of Justice ("DOJ") and the Connecticut Attorney General's Office ("CTAG") have both issued subpoenas to as many as a dozen generic drug companies concerning prices of generic drugs.

14.     DOJ's and CTAG's investigations began in the summer of 2014, with both of these agencies issuing subpoenas to Lannett and Impax concerning their contacts with competitors, sales, and pricing of digoxin, a common heart medication used to slow down the heart. Subsequently, the DOJ and CTAG issued subpoenas to Par, seeking documents and testimony concerning its pricing of digoxin.

15.     Most recently, on December 12, 2016, the DOJ filed criminal informations against Jeffrey Glazer ("Glazer") and Jason Malek ("Malek"), the respective former Chief Executive Officer and President of Heritage Pharmaceuticals, Inc.  These informations accused Malek and Glazer of conspiring to "knowingly enter[] into and engag[ing] in a combination and conspiracy other persons and entities engaged in the production and sale of generic pharmaceutical products, including doxycycline hyclate, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of doxycycline hyclate sold in the United States."[3]

16.     Additionally, on December 14, 2016, the attorneys general ("AG") of twenty states filed a complaint against multiple generic manufacturers of doxycycline hyclate for conspiring to fix the prices and allocate the market for this medication.[4]

---

[3] "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).
[4] *State of Connecticut v. Aurobindo Pharma USA, Inc*., No. 3:16-cv-2056 VLB (D. Conn.).

17.     Significantly, both the DOJ informations as well as the AG Complaint indicate that these actions by the generic manufacturers of doxycycline hyclate were not isolated and limited to that drug.   The AG Complaint mentions a "wide-ranging series of conspiracies implicating numerous different drugs and competitors."[5]

18.     The   AG   Complaint   acknowledged   that   "[m]ost   of   the   conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a   record   of   their   illegal   conduct.   The   generic   drug   industry,   through   the   aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings,   allowed   these   communications   to   perpetuate.   When   communications   were   made   in writing, or by text message, some of the Defendants even took overt and calculated steps to destroy evidence of those communications."[6]

19.     Defendants' conspiracy to fix, raise, maintain and stabilize the prices of Propranolol has caused and continues to cause consumers and third-party payors to pay supra-competitive prices for Propranolol capsules and tablets.

20.     Plaintiff seeks to certify two classes. The first class (the "Injunctive Class") is a national injunctive class of persons or entities in the United States and its territories who purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Propranolol products manufactured by Defendants during the Class Periods.

21.     The   second   class   (the   "Damages   Class")   includes   all   persons   or   entities   who purchased, paid and/or provided reimbursement for some or all of the purchase price of generic

---

[5] *Id*. at ¶9.
[6] *Id*. at ¶13.

6

Propranolol products manufactured by Defendants during the Class Periods in the states identified herein and the District of Columbia.

## JURISDICTION AND VENUE

22.     Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26), for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the Class Members by reason of violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

23.     This action is also instituted under the antitrust, consumer protection, and common laws of various states for damages and equitable relief, as described in the Claims for Relief below.

24.     Pursuant to 28 U.S.C. §§ 1331 and 1337, Section 16 of the Clayton Act (15 U.S.C. § 26), and 28 U.S.C. § 1367, jurisdiction is conferred upon this Court.

25.     Pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d), venue is proper in this judicial district because during the Class Periods, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District where many of the Defendants are headquartered. Therefore, it is likely that acts in furtherance of the alleged conspiracy took place here. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here.

26.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Propranolol throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and

price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

27.     Plaintiff FOP Miami is a governmental plan established and funded through contributions from the City of Miami and the plan's members, who are current and retired sworn officers from the City of Miami Police Department and their dependents. FOP Miami was established pursuant to a duly executed Trust Agreement for the purpose of providing medical, surgical and hospital care or benefits, including prescription drug benefits, to its members. FOP Miami maintains its principal place of business at 400 NW 2nd Avenue, Miami, Florida, and is a citizen of Florida.  During the Class Period, FOP Miami purchased and paid for some or all of the purchase price for one or more Propranolol capsules and tablets in Florida, Colorado, Tennessee, South Carolina, North Carolina, Georgia, Alabama, and Mississippi thereby suffering injury to its business and property.  FOP Miami paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers.

28.     Defendant Actavis Holdco U.S., Inc. ("Actavis") is a Delaware corporation with its administrative offices at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey, 07054.  In 2012, Watson Pharmaceuticals acquired then-Switzerland-based Actavis Group to form Actavis, plc.  In March 2015, Actavis plc completed a merger with Allergan, plc ("Allergan") and adopted Allergan's name.  In August 2016, Teva (defined below) purchased the Actavis Generics business, which included Defendant Actavis from Allergan.  During the Class Periods, Actavis sold generic Propranolol to customers in this District and other locations in the United States.

29.     Defendant Breckenridge Pharmaceuticals, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business at 1 Passaic Ave., Fairfield, NJ 07004.  During the Class Periods, Breckenridge sold generic Propranolol to customers in this District and other locations in the United States.

30.     Defendant Endo International PLC ("Endo International") is an Irish corporation with its principal place of business located at First Floor, Minerva House, Simmonscourt Road, Ballsbridge, Dublin 4, Ireland.  During the Class Periods, Endo International's subsidiary Qualitest Pharmaceuticals, Inc. ("Qualitest") sold Propranolol in this District and other locations in the United States.

31.     Defendant Heritage Pharmaceuticals Inc. ("Heritage") is a Delaware corporation with its principal place of business at 12 Christopher Way #300, Eatontown, NJ 07724.  During the Class Periods, Heritage sold generic Propranolol to customers in this District and other locations in the United States.

32.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business at 1000 Mylan Boulevard, Canonsburg, Pennsylvania.  During the Class Periods, Mylan Inc. sold generic Propranolol to customers in this District and other locations in the United States through its subsidiaries, Mylan Pharmaceuticals, Inc. and UDL Laboratories, Inc.

33.     Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505.  During the Class Periods, Mylan Pharmaceuticals, Inc. sold generic Propranolol to customers in this District and other locations in the United States.  Defendants Mylan Inc. and Mylan Pharmaceuticals Inc. are collectively referred to as "Mylan."

34.     Defendant Par Pharmaceuticals Holdings, Inc. ("Par") is a Delaware corporation with its principal place of business at One Ram Ridge Road, Chestnut Ridge, NY 10977.  In September 2016, Endo International completed an acquisition of Par at which time it created a combined U.S. Generics segment that included Par and Qualitest, naming the segment Par Pharmaceutical, and Endo International Company.  On information and belief, Qualitest has since merged with Par.

35.     Defendant Pliva, Inc. ("Pliva") is a New Jersey corporation with its principal place of business at 72 Deforest Ave. East Hanover, NJ 07936.  Pliva is a subsidiary of Teva Pharmaceutical Industries, Ltd.  During the Class Periods, Pliva sold generic Propranolol to customers in this District and other locations in the United States.

36.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania.  Teva is a wholly-owned subsidiary of Teva Pharmaceutical Industries Limited, a company organized under the laws of Israel with its principal executive offices at 5 Basel Street, Petach Tikva, Israel 49131. During the Class Periods, Teva sold generic Propranolol to customers in this District and other locations in the United States.

37.     Defendant UDL Laboratories, Inc. ("UDL") is an Illinois corporation with its principal place of business at 1718 Northrock Ct., Rockford, IL 61103.  UDL is a subsidiary of Mylan, Inc.  During the Class Periods, UDL sold Propranolol to customers in this District and other locations in the United States.

38.     Defendant Upsher-Smith Laboratories, Inc. ("Upsher-Smith") is a Minnesota corporation with its principal place of business at 6701 Evenstad Drive, Maple Grove, MN 55369.

During the Class Periods, Upsher-Smith sold Propranolol to customers in this District and other locations in the United States.

39.      Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

40.      All acts alleged in this Complaint to have been done by Defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

## CO-CONSPIRATORS

41.      Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

42.      At all relevant times, each Defendant was an agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE AND INTRASTATE TRADE AND COMMERCE

43.    The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

44.    During the Class Periods, Defendants sold substantial quantities of generic Propranolol in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

45.    Defendants' anticompetitive conduct has substantial intrastate effects in that, *inter alia*, generic Propranolol has been and is offered at higher prices to end-payors inside each respective state than they would have been or would be but for Defendants' conduct. The complete lack of availability of competitive priced generic Propranolol directly impacts and disrupts commerce for end-payors within each state.

46.    Defendants' conduct has had and continues to have a direct, substantial and reasonably foreseeable effect on both interstate commerce and on intrastate commerce in each Class state, including commerce in this District and state, and it will continue to do so if not constrained by the Court.

## FACTUAL ALLEGATIONS

### Generic Drugs and the Pharmaceutical Industry

47.    Defendants manufacture and sell, *inter alia*, generic versions of branded drugs once any applicable patent on the branded drugs expires.

48.    Generic drugs are "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[7] If the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal

---

[7] http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

effect and no difference when substituted for the brand name product."[8] Generics in mature markets often cost as little as 10-15% of the branded drug's price.[9]

49.     Studies have shown that generic drugs' entrance onto the market can quickly erode a branded drug's market share – often 90% of the branded drug's sales. Per IMS Health data, generic drugs as of 2013 account for 86% of all drugs dispensed in the United States.[10]



50.     The more generic versions of a drug available on the market, the lower the prices that consumers and third-party payors have to pay. Each successive generic product in a competitive market lowers the price because each entry increases competition for sales and market

---

[8] *Id.*
[9] FTC Staff Study, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS, at 8 (Jan. 2010), *available at* http://emmanuelcombe.org/delay.pdf.
[10] IMS Institute for Healthcare Informatics, Medicine use and shifting costs of healthcare: A review of the use of medicines in the United States in 2013 (Apr. 2014), at 51, http://www.plannedparenthoodadvocate.org/2014/IIHI_US_Use_of_Meds_for_2013.pdf.

share.  In a competitive market, both the branded manufacturer and the older generic manufacturers lower prices in response to the new competitor, as the following FDA chart shows[11]:



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

51.     Accordingly, generic competition to a branded drug can provide billions of dollars in savings to consumers, pharmacies, other purchasers, private health insurers, health and welfare funds and state Medicaid programs, which reimburse drug purchases for their insureds. A GPhA study found that generic drugs saved the U.S. healthcare system $1.68 trillion between 2005 and 2014, including $254 billion in 2014 alone.[12]

52.     The great benefits of generic competition were recognized by Congress and memorialized with the enactment of the Drug Price and Patent Term Restoration Act of 1984, (the "Hatch-Waxman Act").  The Hatch-Waxman Act simplifies and sets out the regulatory hurdles that generic drug manufacturers have to comply prior to marketing and selling generic drugs.  For

---

[11] FDA, Generic Competition and Drug Prices,
http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm129385.htm.
[12] Generic Pharmaceutical Association, *Generic Drug Savings in the U.S.*, at 1 (2015),
http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

example, rather than having to file a lengthy New Drug Application ("NDA"), the Hatch-Waxman Act provides for a generic drug manufacturer to file an Abbreviated New Drug Application ("ANDA") in order to obtain FDA approval.

53.     An ANDA applicant must show that its generic drug is bioequivalent to the brand drug, and the ANDA applicant can rely on the scientific and clinical data compiled by the Brand's NDA, including safety and efficacy data.  This reliance allows the generic company to forego duplicative and expensive experimentation and performing its own clinical trials.

54.     During the approval process, the FDA will assign a "Therapeutic Equivalence Code" ranging from "AA" to "BX."  An "AB" rating signifies that the approved generic drug is therapeutically equivalent to its branded counterpart.

55.     Due to the price differentials between branded and generic drugs, as well as other institutional features of the pharmaceutical industry, pharmacists liberally (and sometimes are legally required to) substitute a generic drug when consumers fill prescriptions for a branded drug. Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents (AB rated) for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

**Generic Drugs Should Lead to Lower Prices, Absent Collusion**

56.     As is true with any generic drug, Propranolol is a commodity product.  Each generic drug is readily substitutable for another generic of the same brand drug, with price being the main differentiating factor and the basis for competition among generic manufacturers.[13]

---

[13] *See,* FTC, AUTHORIZED GENERIC DRUGS: SHORT-TEERM EFFECTS AND LONG-TERM IMPACT, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price.")

57.     Therefore, Defendants' price increases of Propranolol were against their respective self-interests.  In a competitive market, absent a conspiracy or some outside factor justifying a price increase, if a manufacturer substantially increased the price of Propranolol, its competitors would likely seek to sell more Propranolol to its customers rather than increase its prices by the same amounts.

## The Generic Drug Market is Consolidated

58.     In recent years, the market for generic pharmaceuticals has experienced substantial consolidation.  For example, in 2006, Teva acquired Ivax Corporation for $7.4 billion.  It then acquired Ben Laboratories for $7.4 billion in 2008 and Ratiopharma, Germany's second largest generic drug manufacturer, in 2010 for $5 billion.  Watson Pharmaceuticals acquired Actavis and acquired Actavis's name in November, 2012.  In March 2015, Actavis merged with Allergan, and Teva acquired Actavis Generics in 2016.  Additionally, Endo acquired Qualitest Pharmaceuticals for $1.2 billion in 2010 and Par in 2016.

59.     As a result of this consolidation, Defendants dominate the U.S. Propranolol generic market.

## Defendants' Opportunities for Collusion

60.     The DOJ is reportedly carefully scrutinizing trade associations in connection with its probe of high generic prices.  According to an intelligence report from Policy and Regulatory Report, a source that was given inside information by someone with knowledge of the DOJ's investigation, the DOJ is looking closely "at trade associations as part of their investigation as

having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[14]

61.     Throughout the year generic drug manufacturers attend trade shows, including ones hosted by GPhA, the National Association of Chain Drug Stores, the Healthcare Distribution Management Association (now the Healthcare Distribution Alliance), and Efficient Collaborative Retail Marketing.

62.     These trade shows and conferences provide Defendants' representatives the opportunity to interact with each other directly, and discuss their respective businesses and customers.  Recreational and social events at these conferences, such as golf outings, lunches, cocktail parties, dinners, and other activities at these trade shows and conferences provide additional opportunities for conspirators to meet with competitors away from the usual business setting.  Defendants' representatives use these functions to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information.

63.     In addition to trade shows and conferences, representatives of generic drug manufacturers gather in smaller groups, allowing them to meet face-to-face with their competitors and discuss their business.  A large number of generic drug manufacturers, including two of the Defendants, have offices in close proximity to one another in New Jersey, Pennsylvania, or New York, providing them frequent opportunities to collude.  High level executives of Defendants meet periodically for what some of them refer to as "industry dinners."

---

[14] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up the food chain*, FIERCEPHARMA (Aug. 7, 2015), available at
http://www.fiercepharma.com/regulatory/actavis-gets-subpoena-as-doj-probe-of-generic-pricing-moves-up-food-chain.

64.     As a result of these opportunities, Defendants' sales and marketing executives are well aware of their competition, and each other's current and future business plans.   This opportunity often leads to agreements among competitors to fix prices or allocate a given market as to avoid competition with one another.

65.     Defendants communicate and share pricing and bidding strategy with each other.

66.     Defendants also share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection and rebates.

**Market for Generic**

67.     The market for generic Propranolol is mature. Defendants must compete on price in order to gain market share.

68.     The GPhA is the "leading trade association for generic drug manufacturers and distributors, manufacturers of bulk active pharmaceutical chemicals, suppliers of other goods and services to the generic industry."   GPhA was formed in 2000 from the merger of three industry trade groups: GPhA, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

69.     According to the GPhA website, "GPhA member companies supply approximately 90 percent of generic prescription drugs dispensed in the U.S. each year."   GPhA states that, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry and help secure the future of this vital pharmaceutical market segment.  In addition, GPhA provides valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections." [15]

---

[15] http://www.gphaonline.org/about/membership.

70.     Defendants attended the GPhA Fall Technical Conference in Bethesda, Maryland from October 28-30, 2013.

71.     This meeting, as well as those described *supra*, provided Defendants with the opportunities to collude, and on information and belief, at these meeting Defendants agreed to increase the price for Propranolol.

### Pricing of Propranolol Inexplicably Rises

72.     Defendants are the generic manufacturers of various formulations of generic Propranolol in the U.S. that received FDA approval to market Propranolol as early as the 1980s.

73.     Defendant Mylan has had FDA approval to market Propranolol tablets since 1985, and Actavis has had FDA approval to market Propranolol tablets since 1986, and Pliva has had FDA approval to market Propranolol tablets since 1990.

74.     Additionally, Mylan and Actavis have had FDA approval to market Propranolol capsules since 2007, and Heritage has had FDA approval to market Propranolol capsules since 2008.

75.     Prior to December 2013, the average price paid in the U.S. for Propranolol was remarkably stable.  Following Defendants' attendance at the October 2013 GPhA meeting in Bethesda, Maryland from October 28-30, 2013, Propranolol capsule prices across all competitors suddenly and markedly increased. Beginning in December 2013, the average price of Propranolol capsules increased by over 150% in a matter of months.

76.     In 2012, the Centers for Medicare and Medicaid Services commissioned a company called Myers and Stauffer to take surveys of pharmacies across the U.S. to determine the average price of prescription drugs.  The National Average Drug Acquisition Cost ("NADAC") is a master

list which is updated and published weekly.  This list calculates the cost per pill that drug manufacturers charge for their medications.

77.     According to The U.S. Government Accountability Office ("GAO")[16] and price data gathered by the NADAC,[17] Propranolol capsules experienced "extraordinary price increases:"

      a.    By July 2014, the average price of Propranolol 60 mg ER capsules had increased by 164% from pre-December 2013 prices;

      b.    By September 2014, the average price of Propranolol 80 mg ER capsules had increased by 174% from pre-December 2013 prices;

      c.    By July 2014, the average price of Propranolol 120 mg ER capsules had increased by 181% from pre-December 2013 prices;

      d.    By October 2014, the average price of Propranolol 160 mg ER had increased by 174% from pre-December 2013 prices.

78.     Defendants' price increases on Propranolol capsules occurred in lockstep. Propranolol capsule price increases remained at supra-competitive levels throughout the Class Period.

79.     Defendants price increases on Propranolol tablets were even more astounding. Following the GPhA Fall Technical Conference in Miami, Florida from February 9-11, 2015, which each defendant attended, the average price of Propranolol tablets increased by over 700% in a matter of months:

---

[16] *See* United States Government Accountability Office, Report of Congressional Requesters, Generic Drugs Under Medicare, Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases (August 2016) at 37, available at http://www.gao.gov/assets/680/679055.pdf.

[17] *See* NDAC (National Average Drug Acquisition Cost) weekly reference data from November 2013 to current week available at https://data.medicaid.gov/Drug-Prices/NDAC-National-Average-Drug-Acquisiton -Cost-/a4y5-998d.

    a.      By September 2015, the average price of Propranolol 10 mg tablets had increased by 818% from pre-February 2015 prices;

    b.      By November 2015, the average price of Propranolol 20 mg tablets had increased by 892% from pre-February 2015 prices;

    c.      By February 2016, the average price of Propranolol 40 mg tablets had increased by 1008% from pre-February 2015 prices;

    d.      By November 2015, the average price of Propranolol 80 mg tablets had increased by 1033% from pre-February 2015 prices.

80.    Defendants' price increases on Propranolol tablets occurred in lockstep and remained elevated at supra-competitive levels during the Class Period.

81.    There were no reasonable justifications for the sudden price hike of Propranolol. Competition in the marketplace did not change and there were no reported shortages.

82.    Federal law requires drug manufacturers to report potential drug shortages to the FDA, along with the reasons for those shortages, and their expected duration.  Defendants made no such reports with respect to Propranolol during the Class Periods.

83.    In a report dated April 21, 2015, Sector & Sovereign Research concluded that: "A plausible explanation is that generic manufacturers…are cooperating to raise prices of products whose characteristics (low sales due to either very low prices or very low volumes) accommodate price inflation."[18]

---

[18] *See US Generic Inflation Continues in 1Q15* (Apr. 21, 2015), *available at* http://www.sector-sovereign.com/abccahmck-us-generic-inflation-continues-in-1q15/.

84.     The NDAC data for generic Propranolol capsules reveals a pattern of massive price increases beginning as early as 2013, and vastly increasing in 2014, after which prices remain elevated well above their previous competitive levels to the present day.

85.     Based on NADAC data, the average per unit price for generic Propranolol 60 mg ER capsules:



86.     NADAC data for generic Propranolol 80 mg ER capsules reveals a similar pattern:



87.    NADAC data for generic Propranolol 120 mg ER capsules reveals a similar pattern:



88.    NADAC data for generic Propranolol 160 mg ER capsules reveals a similar pattern:



89.     Defendants also attended the GPhA Annual Meeting in Miami Beach, Florida on February 9-11, 2015.  Within a few weeks of the conference in Miami Beach in February 2015, the average prices for Propranolol tablets began to increase by astonishing amounts.

   a.     By September 2015, the average price of Propranolol 10 mg tablets had increased by 818% from pre-February 2015 prices;

   b.     By November 2015, the average price of Propranolol 20 mg tablets had increased by 892% from pre-February 2015 prices;

   c.     By February 2016, the average price of Propranolol 40 mg tablets had increased by 1008% from pre-February 2015 prices;

   d.     By November 2015, the average price of Propranolol 80 mg tablets had increased by 1033% from pre-February 2015 prices.

90.     Based on NADAC data, the average per unit price for generic Propranolol 10 mg tablets:



91.    NADAC data for generic Propranolol 20 mg tablets reveals a similar pattern:



92.    NADAC data for generic Propranolol 40 mg tablets reveals a similar pattern:



93.    NADAC data for generic Propranolol 60 mg tablets reveals a similar pattern:



94.    NADAC data for generic Propranolol 80 mg tablets reveals a similar pattern:



95.    Without changes in the market or supply shortages, competition in the market for

generic Propranolol should have remained as it had since 2013 (for capsules) and 2015 (for tablets)

resulting in low prices.  This sudden unexplained and sustained price increase can be reasonably inferred to be caused by anticompetitive behavior by the generic manufacturers, *i.e.*, illegal collusion among the generic manufacturers to fix, raise, maintain or stabilize the price of generic Propranolol.

96.     Federal law requires drug manufacturers to report potential drug shortages to the FDA, the reasons therefor, and the expected duration of the shortage.  No supply disruption was reported by Defendants with respect to Propranolol during the Class Periods.

97.     Defendants' pricing conduct smacks of collusion, as multiple competitors at multiple times for multiple products have engaged in mirror-image price raises to untenable and anticompetitive levels, to the great detriment of the purchasing public.

98.     As illustrated in the charts above, prices for these generic drugs had been both stable and low for years prior to Defendants' huge increases.

### Government Responses and Defendants' Corporate Filings

99.     During approximately this same period of time that Propranolol prices quadrupled, prices for a number of other generic drugs also increased dramatically.  For example, the price of a generic antibiotic, doxycycline rose 8,281% between October 2013 and April 2014.[19]

100.    Due to the huge increase in this and other generic prices, Congress and state governments began inquiries into numerous generic drug manufacturers' actions. The pricing data and other evidence resulted from these investigations.

---

[19]   http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

101.     On or about October 2, 2014, U.S. Senator Bernie Sanders and U.S. Congressman

Elijah Cummings sent letters to several generic drug manufacturers, including Defendants

Actavis, Endo, Heritage, Mylan and Teva.

102.     The letters stated:

This dramatic increase in generic drug prices results in decreased access for patients.   According to the National Community Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country 'have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to operate' and '77% of pharmacists reported 26 or more instances over the past six months of a large upswing in the generic drug's acquisition price.'  These price increases have a direct impact on patient's ability to purchase their needed medications.  The NCPA survey found that 'pharmacists reported patients declining their medication due to increased co-pays…'[20]

103.     The letters requested the companies to provide documents and information from

2012 to the present, including total gross revenues from the sales of the drugs in question; the date,

quantities, purchasers and prices paid for all sales of the drugs; total expenses relating to the sales

of the drugs, as well as the specific amounts for manufacturing, marketing and advertising, and

purchases of active pharmaceutical ingredients ("API"), if applicable; sales contracts or purchase

agreements for API for the drugs, including any agreements relating to exclusivity, if applicable;

a description and valuation of the specific financial and non-financial factors that contributed to

the various companies' decisions to increase the prices of the drugs; any cost estimates, project

projections, or other analyses relating to the companies' current and future sales of the drugs;

prices of the drugs in all foreign countries or markets, including price information for the countries

paying the highest and lowest prices; and the identity of official(s) responsible at each company

for setting the prices of these drugs over the above time period.[21]

---

[20] *Id*.
[21] *Id*. at 3.

104.   Sen. Sanders and Rep. Cummings held a hearing in November 2014 entitled "Why Are Some Generic Drugs Skyrocketing In Price?"   Price increases of generics drugs were discussed, but no chief executive of a generic drug manufacturer testified.

105.   After Sen. Sanders' held a Senate hearing, on February 24, 2015, Rep. Cummings and Sen. Sanders wrote to the U.S. Department of Health & Human Services' Office of the Inspector General ("OIG"). They asked OIG to investigate how Defendants' price increases, affected spending in the Medicare and Medicaid programming.[22] OIG accordingly began to review quarterly average manufacturer prices for the top 200 generic drugs from 2005 to 2014.[23]

106.   On the state level, Connecticut attorney general George Jepsen issued subpoenas to numerous generic manufacturers in July 2014, on the basis that there was reason to believe that generic manufacturers engaged in a conspiracy which "has the effect of, (a) fixing, controlling or maintaining prices, rates, quotations, or fees; or (b) allocating or dividing customers or territories…"[24]

107.   The DOJ also launched a probe into alleged price-fixing among generic manufacturers. In November 2014, the DOJ issued grand jury subpoenas to many generic manufacturers requesting documents, information, and testimony relating to "communication or correspondence with any competitor in the sale of generic prescription medications." Impax Laboratories, Inc. was the first to disclose having received a subpoena.[25]   Additional subpoenas were issued in May 2016, and there may be additional ones issued.

---

[22] http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[23] http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

[24] Impax Laboratories (IPXL) Receives Subpoena from Connecticut AG, http://www.streetinsider.com/Corporate+News/Impax+Laboratories+(IPXL)+Receives+Subpoena+from+Connecticut+AG/9662945.html.

[25] Impax Laboratories, Inc. Current Report (Form 8-K) (November 3, 2014).

108.   On December 12, 2016, the DOJ filed criminal informations against Glazer and Malek, the respective former Chief Executive Officer and President of Heritage Pharmaceuticals, Inc.  These informations accused Malek and Glazer of conspiring to "knowingly enter[] into and engag[ing] in a combination and conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products, including doxycycline hyclate, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of doxycycline hyclate sold in the United States."[26]

109.   A press release issued by DOJ in conjunction with these filings stated:

"Millions of Americans rely on prescription medications to treat acute and chronic health conditions.  By entering into unlawful agreements to fix prices and allocate customers, these two executives sought to enrich themselves at the expense of sick and vulnerable individuals who rely upon access to generic pharmaceuticals as a more affordable alternative to brand-name medicines," said Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division.  "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."

"Conspiring to fix prices on widely-used generic medications skews the market, flouts common decency – and very clearly breaks the law," said Special Agent in Charge Michael Harpster of the FBI's Philadelphia Division.  "It's a sad state of affairs when these pharmaceutical executives are determined to further pad their profits on the backs of people whose health depends on the company's drugs.  The FBI stands ready to investigate and hold accountable those who willfully violate federal antitrust law."

Today's charges are the result of an ongoing federal antitrust investigation into price fixing, bid rigging and other anticompetitive conduct in the generic pharmaceutical industry, which is being conducted by the Antitrust Division's Washington Criminal I Section with the assistance of the FBI's Philadelphia Division, the FBI headquarters' International Corruption Unit, the United States Postal Service Office of

---

[26] "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).

Inspector General and the U.S. Attorney's Office for the Eastern District of Pennsylvania.[27]

110.    On December 14, 2016, the attorneys general ("AG") of twenty states filed a complaint against multiple generic manufacturers of doxycycline hylclate for conspiring to fix the prices and allocate the market for this medication.[28]

111.    The AG Complaint acknowledged that "[m]ost of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate. When communications were made in writing, or by text message, some of the Defendants even took overt and calculated steps to destroy evidence of those communications."[29]

112.    Significantly, both the DOJ press release as well as the AG Complaint indicate that these actions by the generic manufacturers of doxycycline hylclate were not isolated and limited to doxycycline hyclate.   The AG Complaint mentions a "wide-ranging series of conspiracies implicating numerous different drugs and competitors."[30]

113.    On December 2015, Defendant Endo received Interrogatories and Subpoenas Duces Tecum from the Connecticut AG requesting information regarding pricing of certain of its generic products.

114.    On June 21, 2016, Teva received a subpoena from the DOJ seeking documents and other information relating to the marketing and pricing of certain of Teva's generic products and

---

[27] https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.
[28] *State of Connecticut v. Aurobindo Pharma USA, Inc*., No. 3:16-cv-2056 VLB (D. Conn.)
[29] *Id*. at ¶13.
[30] *Id*. at ¶9.

communications with competitors about such products.  Defendant Actavis has also received a similar subpoena in June 2015.

115.    On July 12, 2016, Teva received a subpoena from the Connecticut AG seeking documents and other information relating to potential state antitrust law violations.  Defendant Actavis also received a similar subpoena from the Connecticut AG.

116.    On November 9, 2016, Mylan disclosed in its 10-Q report that it had received numerous federal and state subpoenas concerning its marketing, pricing, and sale of various generic drugs.  It disclosed that:

> On December 3, 2015, a subsidiary of Mylan N.V. received a subpoena from the Antitrust Division of the U.S. DOJ seeking information relating to the marketing, pricing, and sale of our generic Doxycycline products and any communications with competitors about such products.
>
> On September 8, 2016, a subsidiary of Mylan N.V., as well as certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metaform, **propranolol** and Vernpamil products and any communications with competitors about such products.  Related search warrants also were executed…
>
> On December 21, 2015, the Company received a subpoena and interrogatories from the Connecticut Office of the Attorney General seeking information relating to the marketing, pricing and sale of certain of the Company's generic products and communications with competitors about such products.[31] (emphasis added).

117.    As reflected in Chapter 3 of the 2014 edition of the DOJ's ANTITRUST DIVISION MANUAL,[32] the fact that these drug manufacturers and /or their employees received subpoenas from a federal grand jury is significant.  Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation

---

[31] https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/my110q_20160930xdoc.htm.

[32] http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id*. at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id*. at III-83. "The investigation should be conducted by the grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id*.

### Collusion in the Generic Drug Market

118. The United States generic market displays various qualities that place it at risk of collusion and other anticompetitive behavior. Such qualities include: (1) high concentration; (2) high barriers to entry; (3) inelasticity of demand; (4) lack of available product substitutes; and (5) opportunities to conspire.

119. **Concentration in the Market.** Concentration in a market for goods creates susceptibility for collusion and other anticompetitive conduct. The market for Propranolol is highly concentrated. Defendants each possess large market shares in their respective markets. Only a handful of competitors exist in each market.

120. The limited number of manufacturers in these markets facilitated Defendants' ability to coordinate prices of their generic drugs.

121.    **High Barriers to Entry.** Typically, markets for goods that have high prices attract new competitors who can undercut competition by offering lower prices to the consuming public, thus mitigating effects of collusion. However, when a market has high barriers to entry, new competitors are less likely to enter the market. Accordingly, high barriers to entry facilitate collusive behavior.

122.    The market for generic Propranolol has high barriers to entry, including regulatory, intellectual property and financial hurdles.

123.    All generic drug manufacturers must receive FDA approval prior to marketing and selling products. FDA approval requires, *inter alia*, the preparation and filing of an ANDA, which typically costs at least $1 million.[33]

124.    Further, both state and federal law govern the operation of drug manufacturing facilities. Such costs of doing business are another regulatory barrier to entry for potential competitors.

125.    Intellectual property costs can include acquisition of and litigation over patent rights, either through the investigation of whether a drug compound is protected by a valid patent or for establishment of preferred generic treatment under the Hatch-Waxman Act. Transactional costs such as licensing deals can add further layers of costs.

126.    Finally, generic drug makers also incur large research and development costs, high labor costs to retain employees with specialized skills and knowledge as well as professional certifications suitable for the work required, significant capital outlay for sufficient real estate and equipment, and other corporate financial requirements inherent to the pharmaceutical industry.

---

[33] Testimony of Dr. Scott Gottlieb, Hearing on "Why Are Some Generic Drugs Skyrocketing in Price?" (Nov. 20, 2014), available at https://www.aei.org/wp-content/uploads/2014/11/Gottlieb-Generic-Drug-Testimony-112014.pdf, at 7.

127.    The small number of competitors in the generic Propranolol market reflects these high barriers to entry. However, the price of generic Propranolol has not responded in kind to the new entrants. Instead, prices have continued to rise or at least stabilize at supra-competitive levels.

128.    **Inelastic Demand.**  In economics, elasticity of demand is the sensitivity of supply and demand to changes in one or the other.  Price elasticity is defined as the measure of how much the quantity demanded will change if price, a separate factor, changes. When price elasticity of demand is inelastic, prices increase because there will only be a small decrease in demand relative to the price increase, such that the increases make up for the decreases. Accordingly, total revenues rise in a market with price inelasticity of demand, even if raw sales figures go down.

129.    Perfectly inelastic demand occurs when consumers would pay anything for a good, such as food or water, that is necessary for survival. Colluding entities can profit handsomely from goods that have nearly perfectly inelastic demand because they can charge whatever they wish knowing, first, that consumers will pay whatever price is charged, and second, that the collusion blocks any kind of competition that should serve to lower prices in that market.

130.    Accordingly, Defendants have been able to reap materially significant profits as a result of attacking the integrity of the market for generic Propranolol, as the market for the drug displays a price inelasticity of demand.

131.    **Lack of Available Product Substitutes.** Many patients require the use of Propranolol, whose conditions are not treated effectively by the use of alternative products. Further, because very few suppliers of the raw materials used to manufacture these drugs exist, Defendants end up using many of the same suppliers. Thus, a high proportion of the available raw materials used to treat applicable medical conditions end up in Defendants' products, leaving consumers with a lack of available substitutes for anticompetitively priced Propranolol.

132.   **Opportunities to Conspire.** Defendants' collusive scheme works because each Defendant has constant and continuous opportunities to meet rather than to compete. All Defendants participate in some capacity in GPhA, a leading trade association for generic drug manufacturers and distributors. "Regular Members" are "corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[34]

133.   Moreover, the DOJ's grand jury subpoenas and informations also indicate that communication between Defendants was prevalent. The DOJ has stated that "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[35]

## ANTITRUST EFFECTS AND VIOLATIONS

134.   During the Class Periods, Plaintiff and Damages Class Members purchased substantial amounts of Propranolol capsules and tablets indirectly from Defendants. Because of Defendants' illegal conduct set forth herein, the End-Payor purchasers have paid, and are still paying, artificially and substantially inflated prices for Propranolol.

135.   Plaintiff and Damages Class Members have sustained substantial losses and resultant damage to their business and property in the form of overcharges. These losses and damage will continue to accrue until the anticompetitive conduct set forth herein ceases. The full amount of such damages will be determined at trial.

---

[34] GPhA, Membership, http://www.gphaonline.org/about/membership.
[35] http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

136.    These losses are caused directly by Defendants' anticompetitive conduct, which had at least the following effects:

a.    Price competition in the market for generic Propranolol has been artificially restrained, suppressed or eliminated in the United States;

b.    Prices for generic Propranolol sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and supra-competitive levels; and

c.    Purchasers of generic Propranolol from Defendants have been deprived of the benefit of free and open competition in the market for generic Propranolol.

137.    At all relevant times, Defendants sold Propranolol within the continuous and uninterrupted flow of interstate commerce. Defendants transmitted invoices, contract, funds and other forms of business communication throughout this time.

138.    The pricing and regulation in the generic drugs industry means that overcharges at higher levels of the distribution chain get passed down to end-payors such as Plaintiff and Damages Class Members. Wholesalers and retailers who incurred higher charges for Propranolol due to Defendants' behavior simply passed on those charges to the indirect purchasers.

139.    During the Class Periods, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize the prices of generic Propranolol in the United States.

140.    In forming, effectuating and operating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect

of which were to artificially raise, fix, maintain, and/or stabilize the price of generic Propranolol

sold in the United States. These activities include the following:

     a.    Defendants met in person or telephonically to discuss the price of generic Propranolol in the United States;

     b.    Defendants agreed during those meetings and conversations to charge set prices and otherwise to increase or maintain prices of generic Propranolol sold in the United States;

     c.    Defendants agreed during those meetings and conversations to fix the price of generic Propranolol;

     d.    Defendants issued price announcements in accordance with their agreements; and

     e.    Defendants actually set prices in accordance with their agreements.

141.    Defendants' anticompetitive behavior allowed them to charge the purchasing public prices higher than what they would have been able to charge otherwise.

142.    Inflated prices for consumers purchasing Propranolol were a direct, traceable and foreseeable result of Defendants' conspiracy.

143.    Plaintiff and Damages Class Members purchased generic Propranolol from Defendants or their affiliates or co-conspirators at inflated, supra-competitive prices during the period of the conspiracy.

144.    Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and the laws of various states.

145.    But for Defendants' anticompetitive conduct, Plaintiff and Damages Class Members would not have paid these inflated prices. Accordingly, Plaintiff and Damages Class Members have been injured in their business and property in that they paid more for generic Propranolol than they would have paid in a competitive market.

## CLASS ALLEGATIONS

146.    Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Propranolol capsules and/or tablets from December 1, 2013 and February 1, 2015, respectively through the present or the date on which the anticompetitive effects subside.

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Propranolol products for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Propranolol products were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers and (g) any judges or justices involved in this action and any members of their immediate families.

147.    Plaintiff also brings this action on behalf of itself and as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition and consumer protection laws of the states listed below (the "Indirect Purchaser States")[36] on behalf of the following class (the "Damages Class"):

---

[36] The "Indirect Purchaser States" are Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

All persons and entities in the Indirect Purchaser States who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Propranolol capsules and/or tablets from December 1, 2013 and February 1, 2015, respectively through the present or the date on which the anticompetitive effects subside.

This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Propranolol products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Propranolol products were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

148.    The Nationwide Class and the Damages Class are herein referred to as the "Classes." Members of each Class may be referred to as "Class Members."

149.    The Classes are each individually sufficiently numerous. Plaintiff believes there are hundreds of thousands, if not millions, of members in each Class, in an amount to be determined in discovery and at trial. The identities of Class Members will be readily ascertainable through business records kept in regular order.

150.    Common questions of law and fact exist as to all Class Members. The effects of Defendants' conspiracy were generally applicable to all Class Members, thereby making relief appropriate with respect to the Classes as a whole. Such questions of law and fact common to the Classes include but are not limited to:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Propranolol;

b.    Whether Defendants and their co-conspirators allocated markets for

customers for generic Propranolol sold in the United States;

c.     Whether Defendants' conduct harmed competition in the market for generic Propranolol;

d.     Whether Defendants' conduct has substantially affected interstate and intrastate commerce;

e.     Whether, and to what extent, Defendants' conduct caused and/or is causing antitrust injury to the business or property of Plaintiff and Damages Class Members in the nature of overcharges;

f.     The quantum of overcharges paid by Plaintiff and Damages Class Members;

g.     The participants in the alleged conspiracy;

h.     The duration of the alleged conspiracy;

i.     The acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

j.     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

k.     Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second Claim for Relief;

l.     Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and the Class Members, thereby entitling Plaintiff and the Class Members to disgorgement of all benefits derived by Defendants, as alleged in the Third Claim for Relief;

m.     Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class Members;

n.     The effect of the alleged conspiracy on the prices of generic Propranolol sold in the United States during the Class Period;

o.     The appropriate injunctive and related equitable relief for the Nationwide Class; and

p.     The appropriate class-wide measure of damages for the Damages Class.

151.   Plaintiff's claims are typical of the claims of the Class Members. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all Class Members are all affected

by Defendants' wrongful conduct in the same way, in that they paid artificially inflated prices for generic Propranolol purchased indirectly from the Defendants and/or their co-conspirators.

152.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other Class Members. Plaintiff's interests coincide with, and are not antagonistic to, those of the other Class Members. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

153.    The questions of law and fact common to Class Members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

154.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons or entities located throughout the United States to prosecute common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would require. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining relief for claims that could not practicably be pursued individually, substantially outweigh any difficulties that may arise in management of this class action.

155.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**FIRST CLAIM FOR RELIEF**
**Violation of Sections 1 and 3 of the Sherman Act**
**(on behalf of Plaintiff and the Nationwide Class)**

156.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

157.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade, in violation of Section 1 and Section 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

158.    The acts done by each Defendant as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

159.    During the Class Periods, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to establish a price floor and artificially fix, raise, stabilize, and control prices for generic Propranolol, thereby creating anticompetitive effects in the markets therefor.

160.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for generic Propranolol.

161.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated indirect purchasers in the Nationwide Class who purchased generic Propranolol have been harmed by being forced to pay inflated, supra-competitive prices for generic Propranolol.

162.    In formulating and carrying out the alleged agreement, understanding, contract, combination and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

163.    Defendants' conspiracy had the following effects, among others:

a.    Price competition in the market for generic Propranolol has been artificially restrained, suppressed or eliminated in the United States;

b.    Defendants' prices for generic Propranolol have been raised, fixed, maintained, or stabilized at artificially high and supra-competitive levels; and

c.      Purchasers of generic Propranolol from Defendants have been deprived of the benefit of free and open competition in the market for generic Propranolol.

164.    Plaintiff and members of the Nationwide Class have been and will continue to be injured in their business and property by paying more for generic Propranolol purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

165.    The alleged contract, combination or conspiracy violates the federal antitrust laws, including the Sherman Act.

166.    Plaintiff and members of the Nationwide Class are entitled to injunctive relief, preventing and restraining Defendants from committing the violations alleged herein.

<u>**SECOND CLAIM FOR RELIEF**</u>
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiff and the Damages Class)**

167.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

168.    During the Class Periods, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Propranolol in unreasonable restraint of trade and commerce, in violation of the various state antitrust and consumer protection statutes set forth below.

169.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for generic Propranolol and to allocate customers for generic Propranolol in the United States.

170.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a)

participating in meetings and conversations among themselves in the United States during which they agreed to price generic Propranolol at specified levels, and otherwise to fix, increase, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to generic Propranolol provided in the United States; and (b) participating in meetings and conversations among themselves in the United States to implement, adhere to, and enforce their unlawful agreements.

171.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of generic Propranolol.

172.    Defendants' knowingly and willfully carried out the anticompetitive acts described above. There was and is no legitimate, non-pretextual, procompetitive business justification for Defendants' contract, conspiracy or combination that outweighs its harmful effects. Accordingly, these acts constitute violations or flagrant violations of the antitrust laws of various states.

173.    Alternatively, during at least the Class Periods, there has been a gross disparity between the price that Plaintiff and Damages Class Members paid for generic Propranolol compared to what they would have paid under competitive market conditions, which should and would have been present but for Defendants' unlawful and inequitable conduct.

174.    Said disparity was a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, from which Plaintiff and Damages Class Members were deprived of the opportunity to purchase competitively priced Propranolol from Defendants and were forced to pay higher prices for generic Propranolol than they otherwise would have paid.

175.     Accordingly, Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state antitrust and/or consumer protection statutes.

176.     By engaging the foregoing conduct, Defendants have threatened the business or property of Plaintiff and thus violated the antitrust laws of various states, and/or they have participated in unfair competition or unfair or deceptive acts or practices in violation of state unfair and deceptive trade practices and consumer protection statutes of various states, both of which are listed herein:

a.     Ala. Code §§ 8-10-1 and 6-5-60(a), with respect to purchases in Alabama by Damages Class Members;

b.     Ariz. Rev. Stat. 44-1401, *et seq.*, with respect to purchases in Arizona Damages Class Members;

c.     Cal. Bus. & Prof. Code § 16700 *et seq.*, with respect to purchases in California by Damages Class Members;

d.     D.C. Code § 28-4501 *et seq.*, with respect to purchases in the District of Columbia by Damages Class Members;

e.     Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by Damages Class Members;

f.     Haw. Rev. Stat. § 480 *et seq.*, with respect to purchases in Hawaii by Damages Class Members;

g.     Iowa Code § 553 *et seq.*, with respect to purchases in Iowa Damages Class Members;

h.     Kan. Stat. Ann. § 50-101 *et seq.*, with respect to purchases in Kansas by Damages Class Members;

i.     Me. Rev. Stat. Ann. Tit. 10, § 1101 *et seq.*, with respect to purchases in Maine by Damages Class Members;

j.     Mich. Comp. Laws § 445.772 *et seq.*, with respect to purchases in Michigan by Damages Class Members;

k.      Minn. Stat. § 325D.49 *et seq*., with respect to purchases in Minnesota by Damages Class Members;

l.      Miss. Code Ann. § 75-21-1(a) *et seq*., with respect to purchases in Mississippi by Damages Class Members;

m.      Mo. Rev. Stat. § 407.020, *et seq.*, with respect to purchases in Missouri by Damages Class Members;

n.      Neb. Rev. Stat. § 59-801 *et seq.*, with respect to purchases in Nebraska by Damages Class Members;

o.      Nev. Rev. Stat. Ann. § 598A *et seq.*, with respect to purchases in Nevada by Damages Class Members, in that at least thousands of sales of Defendants' PSPs took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by Defendants' conduct;

p.      N.H. Rev. Stat. Ann. § 356:1 *et seq.*, with respect to purchases in New Hampshire by Damages Class Members;

q.      N.M. Stat. Ann. § 57-1-1 *et seq.*, with respect to purchases in New Mexico by members of the Class;

r.      N.Y. Gen. Bus. Law § 340 *et seq.*, with respect to purchases in New York by Damages Class Members;

s.      N.D. Cent. Code § 51-08.1-01 *et seq.* with respect to purchases in North Dakota by Damages Class Members;

t.      Or. Rev. Stat. § 646.705 *et seq.*, with respect to purchases in Oregon by Damages Class Members;

u.      73 P.S. 201-1, *et seq.*, with respect to purchases in Pennsylvania by Damages Class Members;

v.      R.I. Gen. Laws § 6-36-11(a), with respect to purchases in Rhode Island by Damages Class Members;

w.      S.D. Codified Laws § 37-1 *et seq.*, with respect to purchases in South Dakota by Damages Class Members;

x.      Utah Code Ann. § 76-10-3101 *et seq.*, with respect to purchases in Utah by Damages Class Members who are either Utah residents or Utah citizens;

y.  Vt. Stat. Ann. Tit. 9, § 2453, *et seq.*, with respect to purchases in Vermont by Damages Class Members; and

z.  Wis. Stat. § 133.01 *et seq.*, with respect to purchases in Wisconsin by Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for generic digoxin and/or doxycycline in Wisconsin.

## THIRD CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiff and the Damages Class)

177.  Plaintiff repeats the allegations set forth above as if fully set forth herein.

178.  To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

179.  As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on generic Propranolol.

180.  Defendants' financial benefits are traceable to Plaintiff's and Damages Class Members' overpayments for generic Propranolol.

181.  Plaintiff and Damages Class Members have conferred and continue to confer an economic benefit upon Defendants in the nature of profits resulting from the unlawful overcharges described herein, to the economic detriment of Plaintiff and Damages Class Members.

182.  Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and the members of the Damages Class for generic Propranolol manufactured by Defendants during the Class Periods.

183.  It would be futile for Plaintiff and Damages Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly

purchased generic Propranolol, as those intermediaries are not liable and would not compensate Plaintiff and Damages Class Members for Defendants' unlawful conduct.

184.    The economic benefit Defendants derived from overcharging Plaintiff and Damages Class Members for generic Propranolol is a direct and proximate result of Defendants' unlawful and anticompetitive practices.

185.    The financial benefits Defendants derived are ill-gotten gains that rightfully belong to Plaintiff and Damages Class Members, who paid and continue to pay artificially inflated prices that inured to Defendants' benefit.

186.    It would be inequitable under unjust enrichment principles under the laws of each state in the United States as well as the District of Columbia for Defendants to retain any of the overcharges Plaintiff and Damages Class Members paid for generic Propranolol that were derived from Defendants' unfair, anticompetitive and unlawful methods, acts and trade practices.

187.    Defendants are aware of and appreciate the benefits that Plaintiff and the Damages Class Members have bestowed upon them.

188.    Defendants should be ordered to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiff and Damages Class Members, who collectively have no adequate remedy at law.

189.    Plaintiff and Damages Class Members are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct, and to the establishment of a constructive trust consisting of such amount, from which Plaintiff and Damages Class Members may make claims on a *pro rata* basis.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Classes demands judgment that:

A.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein;

C.      Plaintiff and Damages Class Members recover damages, to the maximum extent allowed under such laws, and that joint and several liability be found to accrue against Defendants in an amount to be trebled to the extent such laws permit;

D.      Plaintiff and Damages Class Members recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged

herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect;

F.      Plaintiff and Damages Class Members be awarded restitution, including disgorgement and restitution of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

G.      Plaintiff and the Class Members be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiff and the Class Members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiff and the Class Members have such other and further relief as the case may require and the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: February 6, 2017                               Respectfully submitted,

**SHEPHERD FINKELMAN MILLER & SHAH, LLP**

By: */s/Jayne Arnold Goldstein*
Jayne Arnold Goldstein (Pa. Bar No. 48048)
Natalie Finkelman Bennett
35 East State Street
Media, PA 19063
Tel: 610-891-9880
jgoldstein@sfmslaw.com
nfinkelman@sfmslaw.com

*Attorneys for Plaintiff*